## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

United States of America, *ex rel.*
Michael Lomonaco, D.N.P.,

      Plaintiff-Relator,

v.

Jena Medical Group, LLC; Benjamin
Weiss; Moishe Hoffman; and Wasim
Ahmar, M.D.,

      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civ. A. No. _____

***QUI TAM* COMPLAINT**
(Jury Trial Demanded)

(False Claims Act, 31 U.S.C. §§ 3729-3733)

**DO NOT PLACE IN PRESS BOX**
**DO NOT ENTER ON PACER**

---

## FILED *IN CAMERA* AND UNDER SEAL
## PURSUANT TO 31 U.S.C. § 3730(b)(2)

---

This *qui tam* action is filed by Plaintiff-Relator Dr. Michael Lomonaco, D.N.P., ("Dr. Lomonaco" or "Relator") on behalf of the United States of America ("United States" or "Government"), against Defendants Jena Medical Group, LLC, Benjamin Weiss, Moishe Hoffman (together "Jena Medical"), and Dr. Wasim Ahmar (collectively "Defendants") for treble damages and civil penalties arising from Defendants' unlawful schemes to defraud the Medicare, Medicaid, and Tricare programs by knowingly presenting false or fraudulent claims for reimbursement in violation of the False Claims Act, as amended, 31 U.S.C. §§ 3729 *et seq.* (the "FCA").

Pursuant to 31 U.S.C. § 3730(b)(2), this Complaint is filed *in camera*, is to remain under seal for at least 60 days, and will not be served on Defendants until this Court so orders.

S-1

## I. INTRODUCTION

1.     Dr. Lomonaco has filed this *qui tam* action on behalf of the United States to redress Defendants' brazen and repeated violations of the FCA, the Stark Act, and the Anti-Kickback Statute (the "AKS").

2.     Jena Medical violated the FCA by billing the Government for medical procedures that were medically unsupervised and unnecessary, billing for medical or surgical equipment where none was utilized, and billing for medical services and equipment under the NPI numbers of medical providers who did not provide the services or equipment being billed.  Such claims were not reimbursable under Medicare, Medicaid, or Tricare, and by definition were false claims.

3.     Jena Medical has also engaged in illegal patient referral practices with Dr. Ahmar that violated the Stark Act and/or the AKS.  During Relator's employment with Jena Medical, Defendants entered into a referral arrangement whereby Jena Medical agreed to provide Dr. Ahmar with medical facilities and to refer its patients to Dr. Ahmar for testing and treatment in return for Dr. Ahmar referring his cardiology patients to Jena Medical for general medicine and specialized pain treatment.

4.     This reciprocal referral arrangement between Jena Medical and Dr. Ahmar resulted in each being compensated for referrals to the other in violation of the AKS, and excessive and unnecessary medical services being performed in violation of the Stark Act.

5.     As required by the FCA, Dr. Lomonaco is providing the Attorney General of the United States and the United States Attorney for the Middle District of Florida with a disclosure statement along with all material evidence and information related to this Complaint. This statement is supported by evidence and information that establishes the deliberate presentation of false claims by Defendants to the Government.

## II. JURISDICTION AND VENUE

6.      This action arises under the laws of the United States of America to redress violations of the FCA.  Thus, this Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345, and 31 U.S.C. §§ 3732(a) and 3730(b).   Dr. Lomonaco is not aware of any other complaints filed against Defendants that make the same or similar allegations, or of any public disclosure of the allegations and information contained in this Complaint, other than those made by Dr. Lomonaco himself.  Therefore, he is an original source as defined by the FCA.

7.      This Court has personal jurisdiction over Defendants because they do business in the United States, including in Florida.  Specifically, personal jurisdiction is proper because (1) nationwide service of process is authorized by 31 U.S.C. § 3732(a), and (2) Defendants have sufficient minimum contacts with the United States as a whole, and Florida in particular, including that they can be found in this State, transact or have transacted business in this State, contract to supply services or things in this State, and enter into contracts to be performed in whole or in part by either party in this State.

8.      This Court is a proper venue for this *qui tam* action under 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a), because a substantial part of the events or omissions giving rise to these claims occurred here and because Defendants regularly transact business in the Middle District of Florida.

## III. THE PARTIES

9.      Plaintiff-Relator Dr. Michael Lomonaco, D.N.P., is a citizen of the United States of America and a resident of Seminole County, Florida.  From March 2019 to December 2019, Dr. Lomonaco was employed by Jena Medical as a nurse practitioner specializing in pain management.

3

Dr. Lomonaco brings this action on behalf of the United States based upon his direct, independent, and personal knowledge of the facts alleged herein, as well as other information obtained during the course of his investigation.

10.     Defendant Jena Medical Group, LLC, is a limited liability company founded under the laws of Florida with its principal place of business located in Volusia County, Florida.

11.     Defendant Benjamin Weiss, an individual, is a resident of New Jersey. Mr. Weiss is one of two principal owners of Jena Medical Group, LLC.

12.     Defendant Moishe Hoffman, an individual, is a resident of New Jersey. Mr. Hoffman is one of two principal owners of Jena Medical Group, LLC.

13.     At all relevant times, Mr. Weiss and Mr. Hoffman have both remained active in, and knowledgeable of, the managerial, operational, and financial activities and decisions of Jena Medical Group, LLC.

14.     Defendant Washim Ahmar, M.D., is cardiologist with his principal place of business in Longwood, Florida.

## IV. LAW AND REGULATION

### A.     THE FALSE CLAIMS ACT

15.     The FCA provides, in relevant part, that a person who:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]
>
> (B) knowingly makes, uses, or caused to be made or used, a false record or statement material to a false or fraudulent claim;
>
> …
>
> is liable to the United States Government for a civil penalty of not less than [$11,181] and not more than [$22,363], as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains….

31 U.S.C. § 3729(a)(1); 28 C.F.R. § 85.5.  For purposes of the FCA,

> (1) the terms "knowing" and "knowingly"
>> (A) mean that a person, with respect to information—
>>> (i)    has actual knowledge of the information;
>>> (ii)   acts in deliberate ignorance of the truth or falsity of the information; or
>>> (iii)  acts in reckless disregard of the truth or falsity of the information; and
>> (B)  require no proof of specific intent to defraud[.]

31 U.S.C. § 3729(b)(1).

16.    The FCA defines "material" to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. 3729(b)(4).

**B.    MEDICARE AND MEDICAID**

### THE MEDICARE PROGRAM

17.    In 1965, Congress enacted the Health Insurance for the Aged and Disabled Act (Title XVIII of the Social Security Act), 42 U.S.C. §§ 1395 *et seq.*, commonly known as Medicare, as a health insurance program designed to assist the nation's elderly and disabled meet their healthcare costs.

18.    Centers for Medicare and Medicaid Services ("CMS") administers the Medicare program.  To do so, CMS contracts with private contractors, referred to as Medicare Administrative Contractors ("MACs"), to act as agents in reviewing and paying claims submitted by healthcare providers.  42 U.S.C. §§ 1395h, 1395u; 42 C.F.R. §§ 421.3, 421.100, 421.104.

19.    The Medicare program consists of four parts: A, B, C, and D. Jena Medical billed Medicare under Part B, which covers certain medical services furnished by physicians and other providers.  42 U.S.C. § 1395k(a)(2)(B).

20.     Medicare Part B provides coverage for "medical and other health services." 42 U.S.C. § 1395l(a)(1).  Medicare Part B is financed by premiums paid monthly by enrollees which are subsidized by the Government.

21.     To participate in the Medicare program as a new enrollee, group practices and clinical laboratories must submit a Medicare Enrollment Application, CMS Form-855B.  These providers must also complete Form CMS-855B to change information or to reactivate, revalidate, and/or terminate Medicare enrollment.

22.     Medicare regulations also require an authorized official to certify that they meet, and will continue to meet, the requirements of the Medicare statute and regulations.  42 C.F.R. § 424.516(a)(1).  The authorized official must sign the "Certification Section" in Section 15 of Form CMS-855B, which "legally and financially binds [them] to all of the laws, regulations, and program instructions of the Medicare program."

23.     Upon information and belief, authorized officials at Jena Medical signed the certification statement in Section 15 of Form CMS-855B, indicating that they understood that they were required to comply with Medicare laws, regulations, and program instructions, which include, but are not limited to, the Stark Law and the AKS.

24.     The National Provider Identifier ("NPI") is a standard and unique identifier used by Medicare to process and track payments to health care providers. All providers and practitioners must have an assigned NPI number prior to enrolling in Medicare.

25.     Typically, physicians are compensated for the services they provide Medicare patients on a fee-for-service basis as determined by Medicare's fee schedule. 42 U.S.C. § 1395w-4. To obtain compensation, physicians must deliver a compensable service, certify that the service was medically necessary for the health of the patient, certify that the service was personally

furnished by the physician (or under his or her immediate supervision), and determine the appropriate diagnosis and procedure code to describe the problem and service for billing.

26.     The Medicare statute requires that each request for payment or bill submitted for an item or service payable under Medicare Part B include the name and unique physician NPI number for the referring physician.  42 U.S.C. § 1395l(q)(1).

27.     To obtain Medicare reimbursement for certain outpatient items or services, providers and suppliers submit a claim form known as the CMS 1500 form ("CMS 1500") or its electronic equivalent known as the 837P form.

28.     Among the information the provider or supplier includes on a CMS 1500 or 837P form are certain five-digit codes, including Current Procedural Terminology Codes ("CPT codes") and Healthcare Common Procedure Coding System ("HCPCS") Level II codes that identify the services rendered and for which reimbursement is sought, and the unique NPI number of the "rendering provider" and the "referring provider or other source."

29.     When submitting claims to Medicare, providers certify on the CMS 1500, *inter alia*, that (a) the services rendered are medically necessary for the health of the patient; (b) the information on the claim form is "true, accurate, and complete;" and (c) the provider understands that "payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of material fact, may be prosecuted under applicable Federal and State laws."

30.     After a February 2012 revision to the CMS 1500, providers further certify that their claims comply "with all applicable Medicare … laws, regulations, and program instructions for payment including but not limited to [the Stark Law and the AKS]."  CMS 1500 also requires providers to acknowledge that: "Any person who knowingly files a statement of claim containing

7

any misrepresentation or any false, incomplete, or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

31.     Similarly, when enrolling to submit Medicare claims electronically, providers certify that they will submit claims that are "accurate, complete, and truthful." https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/CMS10164B.pdf        (last visited on February 18, 2020).

32.     Providers have a duty to be familiar with the statutes, regulations, and guidelines regarding coverage for the Medicare services they provide. *Heckler v. Cmty. Health Servs. Of Crawford Cty., Inc.*, 467 U.S. 51, 64 (1984).

33.     Medicare Part B only covers services that are reasonable and necessary for the diagnosis or treatment of an illness. 42 U.S.C. § 1395y(a)(1)(A) ("[N]o payment may be made under [Medicare] part A or part B ... for any expenses incurred for items or services ... which ... are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member[.]").

34.     CMS has broad authority to outline conditions and limitations on whether an item or service is reasonable and necessary, and will be covered by Medicare nationally, through the issuance of a NCD. *See* 42 U.S.C. § 1395ff(f)(1)(B) (defining "national coverage determination" as "a determination by the Secretary with respect to whether or not a particular item or service is covered nationally under this title").

35.     To administer Medicare Part B, CMS relies on a network of MACs that intermediate between CMS and the health care providers that are enrolled in the program. Currently, CMS contracts with nine different MACs, which have all been awarded contracts for one or more geographic jurisdictions.

36.     Among other services, MACs process Medicare claims, make and account for Medicare payments, enroll providers in the Medicare program, respond to provider inquiries, educate providers about Medicare billing requirements, and establish local coverage (or non-coverage) for items or services through Local Coverage Determinations ("LCDs").

37.     At all relevant times, First Coast Service Options, Inc., ("First Coast") was the MAC responsible for processing Medicare Part B claims for Jurisdiction N ("JN"), which includes the State of Florida.

38.     Because it is not feasible for the Medicare program (or its MACs) to review medical records corresponding to each of the millions of claims for payment it receives from providers, the program relies on providers to comply with Medicare requirements and to submit truthful and accurate certifications and claims.  Generally, once a provider submits a CMS 1500 or 837P form to Medicare, the claim is paid directly to the provider in reliance on the foregoing certifications, without any review of supporting documents, including medical records.

39.     During the relevant timeframe, Jena Medical billed Medicare for reimbursement under Part B for unnecessary and unsupervised medical procedures, including for medical procedures performed by non-physicians and unlicensed personnel, by presenting claims for reimbursement to First Coast.

40.     A reimbursement claim is false within the meaning of the FCA if it is submitted by a provider who did not actually provide the service, *i.e.*, if the service was provided by one provider and billed for by another. *See U.S. v. Mackby*, 261 F.3d 821, 826 (9th Cir. 2001) ("[A] claim may be false even if the services billed were actually provided, if the purported provider did not actually render or supervise the service."); *Peterson v. Weinberger*, 508 F.2d 45, 52 (5th Cir. 1975) (similar); *U.S. ex rel. Armfield v. Gills*, 2010 WL 309462, at *1 (M.D. Fla. Jan. 26, 2010)

("Medicare claims may constitute false claims if they seek reimbursement for services that were not rendered as claimed, including if the provider did not actually perform or supervise the services for which payment is sought.")

## THE FLORIDA MEDICAID PROGRAM

41.     The Florida Medicaid Program is authorized by Title XIX of the Social Security Act. 42 U.S.C. §§ 1396 *et seq*. Medicaid is a joint federal-state program that provides health care benefits, including laboratory services coverage, for certain groups, including the poor and disabled.

42.     The Florida Medicaid Program is required to implement a "State Plan" containing certain specified minimum criteria for coverage and payment of claims to qualify for federal funds for Medicaid expenditures. *Id.* § 1396(a). The federal portion of each state's Medicaid payments, known as the Federal Medical Assistance Percentage, is based on a state's per capita income compared to the national average. *Id.* § 1396d(b).

43.     The Florida Medicaid Program is authorized by § 409.902 Fla. Stat., and Chapter 59G, Fla. Admin. Code ("F.A.C."). Section 409.919, Fla. Stat., directs the Florida Agency for Health Care Administration ("AHCA") to "adopt any rules necessary to comply with or administer §§ 409.901-409.920 and all rules necessary to comply with federal requirements."

44.     Medicaid handbooks, such as the Florida Medicaid Provider General Handbook, are issued to furnish Medicaid providers with the policies and procedures needed to receive reimbursement for covered services provided to eligible Florida Medicaid recipients. The handbooks are incorporated by reference in Chapter 59G-4, F.A.C.

45.     Physicians and laboratories certify in their state Medicaid provider enrollment forms that they will comply with all federal and state laws applicable to Medicaid. Florida's

"Medicaid Provider Enrollment Application" must be completed by any person or entity desiring to receive payment for services provided to Medicaid recipients.

46.    Under Section VII of the Application, in order to be eligible to receive direct or indirect payments for services rendered to Florida Medicaid Program recipients, a provider must certify that the provider understands "that false claims, statements, documents, or concealment of material facts may be prosecuted under applicable federal and state laws." Florida Medicaid Provider Enrollment Application, Section VII Certification, at 9.

47.    The Florida Medicaid Provider General Handbook contains the following statement in Chapter 5 at page 5-4:

> **Provider Responsibility** When presenting a claim for payment under the Medicaid program, a provider has an affirmative duty to supervise the provision of, and be responsible for, goods and services claimed to have been provided, to supervise and be responsible for preparation and submission of the claim, and to present a claim that is true and accurate and that is for goods and services that … [a]re provided in accord with applicable provisions of all Medicaid rules, regulations, handbooks, and policies and in accordance with federal, state, and local law…

Chapter 59G of the F.A.C., section 5.020, entitled Provider Requirements, requires that enrolled Medicaid providers must comply with the Florida Medicaid Provider General Handbook.

48.    Under Chapter 2 of the Florida Medicaid Provider General Handbook, laboratory providers are required to fill out the Florida Medicaid Provider Enrollment Application and Non-Institutional Medicaid Provider Agreement. The applicable Medicaid Provider Agreement for Laboratory Services Providers requires that providers agree to comply with "local, state, and federal laws, as well as rules, regulations, and statements of policy applicable to the Medicaid program, including the Medicaid Provider Handbooks issued by AHCA," and refund any moneys received in error within ninety days.

11

49.     Every time they submit an electronic claim to the Florida Medicaid program, physicians and laboratories also certify that they are complying with state and federal laws applicable to the Medicaid program.  According to the Electronic Claims Submission Agreement, all providers must abide by all Federal and State statutes, rules, regulations, and manuals governing the Florida Medicaid program.

50.     The Electronic Claims Submission Agreement also requires providers to certify that each claim is in compliance with all federal and state laws and the conditions on the claim form, including that "the services … were medically indicated and necessary to the health of this patient" and that the provider understands "that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws."

## C.   THE STARK LAW

51.     The federal physician self-referral prohibition, 42 U.S.C. § 1395nn (commonly known as the Stark Law) prohibits an entity from submitting claims to Medicare for certain categories of "designated health services" ("DHS") if such services were referred to the entity by a physician with whom the entity had a financial relationship that did not comply with a statutory or regulatory exception.  42 U.S.C. § 1395nn(a)(1).  The Stark Law further prohibits Medicare from paying claims that do not comply with its terms.  *Id.* § 1395nn(g)(1).

52.     The Stark law was specifically designed to prevent losses that might otherwise be suffered by the Medicare program due to overutilization of DHS, patient steering, and the corruption of physicians' medical judgment by improper financial incentives.

53.     Compliance with the Stark Law is a condition precedent for payment by the Medicare program.  Medicare may not pay for any DHS provided in violation of the Stark Law.

*See id.* § 1395nn(a)(1), (g)(1). Further, the regulations implementing the Stark Law require that "[a]n entity that collects payment for a [DHS] that was performed pursuant to a prohibited referral must refund all collected amounts on a timely basis[.]" 42 C.F.R. § 411.353(d).

54.     A "financial relationship" under the Stark Law includes a "compensation arrangement," which means any arrangement involving any "remuneration" paid to a referring physician "directly or indirectly, overtly or covertly, in cash or in kind" by the entity furnishing the DHS. *See*. 42 U.S.C. §§ 1395nn(h)(1)(A)–(B); 42 C.F.R. 411.351.

55.     A direct compensation arrangement exists "if remuneration passes between the referring physician … and the entity furnishing the DHS without any intervening persons or entities." 42 C.F.R. § 411.354(c)(1)(i). Plus, "a physician is deemed to 'stand in the shoes' of his or her physician organization and have a direct compensation arrangement with an entity furnishing DHS if – (A) The only intervening entity between the physician and the entity furnishing [DHS] is his or her physician organization; and (B) the physician has an ownership or investment interest in the physician organization." 42 C.F.R. § 411.354(c)(1)(ii).

56.     A "referral" includes "the request by a physician for, or ordering of, or the certifying or recertifying of the need for, any [DHS] for which payment may be made under Medicare Part B …." *Id.* § 411.351. A referral "[c]an be in any form, including, but not limited to, written, oral, or electronic." *Id.*

57.     A "referring physician" means "a physician who makes a referral as defined in this section or who directs another person or entity to make a referral or who controls referrals made by another person or entity." *Id.*

58.     The Stark Law is a strict liability statute, with no scienter component. Medicare providers who knowingly submit claims to the Medicare program in violation of the Stark Law

may be found liable for violation of the FCA. *See, e.g., United States ex rel. Drakeford v. Tuomey*, 792 F.3d 364 (4th Cir. 2015). A knowing violation of the Stark Law may also subject the provider to exclusion from participation in the federal healthcare programs and civil monetary penalties. 42 U.S.C. §§ 1395nn(g)(3), 1320a-7a(a).

**D.    THE ANTI-KICKBACK STATUTE**

59.    The AKS prohibits the provision, solicitation, offer or receipt of any remuneration in return for referring an individual for the provision of healthcare services for payment to be made under a federal healthcare program. 42 U.S.C. § 1320a-7b.

60.    "Any remuneration" includes any kickback, bribe, or rebate whether provided directly or indirectly. *Id.* at § 1320a-7b(b)(1).

61.    In addition to criminal penalties, violations of the AKS may result in civil monetary penalties of up to $50,000 per violation, an assessment of up to three times the amount of remuneration paid, and exclusion from participation in federal health care programs. *Id.* at § 1320a-7a.

62.    These penalties reflect the importance and materiality of the prohibition against kickbacks as a critical tool in the fight against health care fraud. *See* H. Rep. 95-393, 95th Cong., 1st Sess. at 44, reprinted in 1977 U.S.C.C.A.N. 3039, 3047 (making violations of the AKS a felony, and explaining that fraud in federal health care programs "cheats taxpayers who must ultimately bear the financial burden of misuse of funds in any government sponsored program").

63.    A claim that includes items or services resulting from a violation of the AKS constitutes a false or fraudulent claim within the meaning of the FCA. 42 U.S.C. § 1320a-7b(g); *see also U.S. ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 313 (3d Cir. 2011).

14

## V.  DEFENDANTS' FRAUDULENT SCHEMES

A.    **JENA MEDICAL'S UNNECESSARY AND UNSUPERVISED VEIN TREATMENTS**

64.    During Relator's employment in 2019, Jena Medical did not have a medical director or licensed physician on site to supervise its employees, the medical procedures they perform, or the day-to-day operations of the facility.   During the course of Relator's employment, which spanned over 10 months, he only saw a supervising physician on site on two occasions.

65.    Because Jena Medical did not have a licensed physician supervise any of the medical services or procedures being performed on its patients, any claims for reimbursement that were submitted to the Government for medical services or procedures that require physician supervision were by definition false claims.

66.    For example, Jena Medical employed an Ultrasound Technician, Shawn Marino, but marketed him in a way that led patients to believe he was a licensed physician.   Under these false pretenses, Mr. Marino performed medically unsupervised endovenous ablation treatments as well as varicose vein procedures (collectively "vein treatments") on Jena Medical's patients without the proper medical education, training, or licensing.

67.    Prior to performing these vein treatments, Mr. Marino would perform an ultrasound on the patient's lower extremities and fraudulently manipulate the results so that the patient would meet the criteria for vascular insufficiency and his or her treatment would be eligible for reimbursement by Medicare, Medicaid, and/or Tricare.

68.    While performing these vein treatments, Mr. Marino would re-use intravenous (IV) catheters on multiple patients, despite the catheter label clearly stating that the catheters are for single use only.   In between his repeat uses of the catheters, Mr. Marino would soak them in a solution in a non-sterile plastic container, then dry the catheters on non-sterile fabric, often piled

one on top of another. He would then repackage the catheters to make it appear as though they were new.

69.     These medically unsupervised vein treatments placed Jena Medical's unsuspecting patients at substantial risk of contracting blood-borne pathogens, which could lead to severe bodily injury or death. Upon information and belief, Mr. Marino has performed these illegal vein treatments on thousands of Jena Medical patients who will likely need medical monitoring and periodic blood testing for the rest of their lives.

70.     Several of Relator's patients have received treatment from Mr. Marino for deep vein thrombosis of the leg. At least two of those procedures later resulted in the patient having a pulmonary embolism. One of those patients had to be referred to the hospital for emergency, life-saving medical treatment.

71.     Several of Relator's other patients have developed cellulitis caused by old catheters that were contaminated with streptococcus or staphylococcus bacteria, after receiving vein treatments by Mr. Marino. These patients had to be admitted to the hospital and treated for bacterial infections with intravenous antibiotics.

72.     Because Mr. Marino is not a licensed healthcare provider, he does not have a National Provider Identifier (NPI) number for purposes of billing Medicare, Medicaid, and/or Tricare for the vein treatments he performs. Instead, Jena Medical fraudulently billed Medicare, Medicaid, and/or Tricare for these procedures using the NPI numbers of its nurse practitioners, despite the fact that those individuals were not involved in the procedures.

73.     Jena Medical also fraudulently billed Medicare, Medicaid and/or Tricare for new catheters for each vein treatment that Mr. Marino performed, when in reality he re-used the same catheters on multiple unsuspecting patients.

74.     Jena Medical then unlawfully disposed of biohazardous medical waste from these procedures by placing it in a standard black garbage bag and throwing it in a dumpster, rather than placing it in a red biohazardous waste bag and disposing of it through the proper and lawful channels.

**B.     DEFENDANTS' ILLEGAL REFERRAL/KICKBACK SCHEME**

75.     Defendants have also engaged in illegal patient referral practices that violated the Stark Act and/or the AKS.

76.     During Relator's employment with Jena Medical, Defendants entered into a referral arrangement whereby Jena Medical agreed to provide facilities and refer its family medicine and pain management patients to Dr. Ahmar for cardiology testing and other medical procedures in return for Dr. Ahmar referring his cardiology patients to Jena Medical for general medicine and specialized pain treatment.

77.     To consummate this referral arrangement, Jena Medical allowed Dr. Ahmar to use Jena Medical's office facilities to provide designated health services to patients who were being referred to him by Jena Medical.  In return, Dr. Ahmar referred his patients to Jena Medical for general medicine and/or pain management. Upon information and belief, this compensation arrangement violated the Stark Law's general prohibition on referrals for designated health services between entities who have a financial relationship.

78.     This reciprocal referral arrangement between Jena Medical and Dr. Ahmar also resulted in both entities being compensated for referrals in violation of the AKS, and caused excessive services to be performed on patients in violation of the Stark Act.

79.     To facilitate this referral arrangement, Jena Medical employees were instructed to run ICD-10 codes and flag patients that met a certain criteria, *e.g.*, hypertension, cholesterol,

venous insufficiency, diabetes, thyroid disorder, etc. Those patients were then automatically referred to Dr. Ahmar and scheduled for a full work-up, including echocardiograms, cardiac stress tests, and heart catheterization diagnostic procedures, despite none of those services being requested or necessary.

80.     The compensation arrangement between Jena Medical and Dr. Ahmar caused prohibited referrals between those entities and significantly increased the amount of medical services for which Jena Medical and Dr. Ahmar received Medicare, Medicaid, and Tricare reimbursements. In turn, this arrangement directly increased Jena Medical's and Dr. Ahmar's profits by increasing the amount of federal dollars that were spent for reimbursements through Medicare, Medicaid, and Tricare.

81.     Accordingly, Defendants' improper financial relationship and prohibited referrals were a direct violation of the Stark Law, 42 U.S.C. § 1395nn, and/or the AKS.

## FIRST CAUSE OF ACTION
### False Claims Act, 31 U.S.C. § 3729(a)(1)(A)
### Presenting and Causing Materially False Claims to Medicare, Medicare, and Tricare

82.     Relator realleges all preceding paragraphs as if fully set forth herein.

83.     During the relevant time period, Defendants knowingly presented, or caused to be presented, materially false and fraudulent claims for payment or approval to the Medicare, Medicaid, and Tricare programs, including claims for reimbursement for medical procedures that were not reasonable and necessary.

84.     Claims that were knowingly presented, or that were caused to be presented, to Medicare, Medicaid, and Tricare by Defendants for these medically unnecessary procedures constitute violations of the FCA, 31 U.S.C. § 3729(a)(1)(A).

85.     Defendants presented these false claims to Medicare, Medicaid, and Tricare for reimbursement with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

86.     Had the United States known that Defendants had knowingly presented, or caused to be presented, false or fraudulent claims to Medicare, Medicaid, and Tricare, the United States would not have paid reimbursements for those false or fraudulent claims.

87.     By virtue of the false and fraudulent claims presented by Defendants, the United States has been damaged and is entitled to recover its actual damages in an amount to be determined at trial, plus treble damages and civil penalties of at least $11,181, but no more than $22,363, for each false claim as provided by the False Claims Act. *See* 31 U.S.C. § 3729(a); 28 C.F.R. § 85.5 (2017).

## SECOND CAUSE OF ACTION
### False Claims Act, 31 U.S.C. § 3729(a)(1)(B)
### False Statements and Records Material to False Claims

88.     Relator realleges all preceding paragraphs as if fully set forth herein.

89.     During the relevant time period, Defendants knowingly made, used, and caused to be made or used false records or statements material to false or fraudulent claims presented to the Medicare, Medicaid, and Tricare programs, and payment of those false or fraudulent claims by Medicare, Medicaid, and Tricare was a reasonable and foreseeable consequence of Defendants' statements and actions.

90.     These false records and statements, including but not limited to false certifications on Medicare provider enrollment forms and false and misleading representations on claim forms, were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

91.     By virtue of the false or fraudulent records and statements made by Defendants, the United States has been damaged and is entitled to recover its actual damages in an amount to be determined at trial, plus treble damages and civil penalties of at least $11,181, but no more than $22,363, for each violation as provided for by the FCA. *See* 31 U.S.C. § 3729(a); 28 C.F.R. § 85.5 (2017).

**THIRD CAUSE OF ACTION**
**False Claims Act, 31 U.S.C. § 3729(a)(1)(A)**
**Presenting and Causing Materially False Claims to Medicare, Medicaid, and Tricare**
**Stark Law and/or AKS Violations**

92.     Relator realleges all preceding paragraphs as if fully set forth herein.

93.     During the relevant time period, Defendants knowingly presented, or caused to be presented, materially false and fraudulent claims for payment or approval to the Medicare, Medicaid, and Tricare programs for designated health services that were referred, or caused to be referred, by Jena Medical to Dr. Ahmar, and by Dr. Ahmar to Jena Medical, all in violation of the Stark Law.

94.     Defendants presented or caused to be presented such claims with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

95.     Had the United States known that Defendants were referring and being referred Medicare, Medicaid, and Tricare patients from an entity with which they had an improper financial relationship, the United States would not have paid reimbursements for any designated health services that were performed on those patients.

96.     By virtue of these Stark Law violations, the United States has been damaged and is entitled to recover its actual damages in an amount to be determined at trial, plus treble damages and civil penalties of at least $11,181, but no more than $22,363, for each violation as provided for by the FCA. *See* 31 U.S.C. § 3729(a); 28 C.F.R. § 85.5 (2017).

20

### FOURTH CAUSE OF ACTION
### False Claims Act, 31 U.S.C. § 3729(a)(1)(B)
### False Statements and Records Material to False Claims
### Stark Law and/or AKS Violations

97. Relator realleges all preceding paragraphs as if fully set forth herein.

98. During the relevant time period, Defendants knowingly made, used, and caused to be made or used false records or statements material to false or fraudulent claims presented to the Medicare, Medicaid, and Tricare programs, and payment of those false or fraudulent claims by Medicare, Medicaid, and Tricare was a reasonable and foreseeable consequence of Defendants' statements and actions.

99. The false records and statements included, but were not limited to, false certifications on Medicare provider enrollment forms and false and misleading representations on claim forms that claims for any designated health services complied with the Stark Law, when, in fact, those claims violated the Stark Law.

100. Defendants made or used, or caused to be made or used, such false records or statements with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

101. By virtue of the materially false or fraudulent records and statements made by Defendants, the United States has been damaged and is entitled to recover its actual damages in an amount to be determined at trial, plus treble damages and civil penalties of at least $11,181, but no more than $22,363, for each violation as provided for by the FCA. *See* 31 U.S.C. § 3729(a); 28 C.F.R. § 85.5 (2017).

**WHEREFORE**, Relator respectfully requests this Court enter judgment against Defendants as follows:

(a)     That the United States be awarded damages in the amount of three times the actual damages the United States sustained by virtue of the false claims alleged within this Complaint, to the full extent provided for by the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*;

(b)     That civil penalties not exceeding $22,363, but no less than $11,181, be imposed for each and every false claim that Defendants presented to the United States and/or its grantees;

(c)     That pre-judgment and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which Relator necessarily incurred in filing and prosecuting this case;

(d)     That the Court grant permanent injunctive relief to prevent any recurrence of the False Claims Act violations for which redress is sought in this Complaint;

(e)     That Relator be awarded the maximum share allowed to her pursuant to the False Claims Act; and

(f)     That this Court award such other and further relief as it deems necessary, just, and proper.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury in this *qui tam* action.

Respectfully Submitted,

February 24, 2020          By:     /s/ Guy M. Burns
                                  Guy M. Burns (Fla. Bar No. 0160901)
                                  GuyB@jpfirm.com

22

**JOHNSON POPE BOKOR RUPPEL & BURNS, LLP**
401 East Jackson Street, Suite 3100
Tampa, FL 33602
P: (813) 225-2500
F: (813) 223-7118

**Pending Admission *Pro Hac Vice***
T. Christopher Tuck (Fed. I.D. #9135)
ctuck@rpwb.com
Robert S. Wood (Fed. I.D. #7965)
bwood@rpwb.com
D. Charles Dukes (Fed. I.D. #11751)
cdukes@rpwb.com
**RICHARDSON, PATRICK, WESTBROOK & BRICKMAN, LLC**
1037 Chuck Dawley Blvd., Bldg. A
Mount Pleasant, SC  29464
P: 843.727.6500
F: 843.216.6509

**ATTORNEYS FOR PLAINTIFF-RELATOR**